IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROBERT COOPER ENGST and ANNA SUSAN ENGST, husband and wife, and the marital community comprised thereof,<br><br>Plaintiffs,<br><br>v.<br><br>USAA CASUALTY INSURANCE COMPANY, a foreign insurance company,<br><br>Defendant. | No. No. 2:19-cv-02074-TSZ<br><br>**DECLARATION OF ROBERT ENGST** |

I, Robert Cooper Engst, declare as follows:

1. I am over the age of 18, competent to be a witness, and have personal knowledge of the matters set forth herein.

2. My wife, Anna Susan Engst, and I own our home at 215 Howe Street in the Queen Anne neighborhood of Seattle, which we purchased in May 2019.

3. After residing in the home for approximately two months, we suffered a devastating water-damage event when my wife and I were on the east coast visiting my wife's relatives and attending a wedding. The supply line to our top-floor toilet failed. When we returned home from this four-day trip, we discovered extensive water damage had impacted nearly every

room on all three floors of our home. Attached as Exhibit 1 are photos of our home before and after the damage.

4. Our insurer, USAA, provided no assistance regarding how to proceed with the clean-up or how to go about obtaining estimates for the repairs.

5. USAA's adjuster, David Glover, told us that the cost of repairs had to be approved by USAA prior to starting any work. We contacted contractors for repair estimates. We first obtained a rough budget from Harjo construction of $208,598, which we provided to USAA along with some notes about repair items that were not included in the estimate. Mr. Glover ignored the Harjo budget. Instead, he created his own estimate using the Xactimate computer program. Mr. Glover's estimate of $92,009 was not based upon any contractor's estimate, did not take into account construction pricing in our neighborhood in Seattle, and used cheaper materials than those that were damaged in our home.

6. We also obtained a comprehensive estimate from Charter Construction along with a detailed construction schedule and provided those to USAA. The repair estimate from Charter Construction was $372,584.

7. My wife and I also tried to obtain a third estimate from a local contractor, McBride Construction, but their estimate was preliminary – and incomplete: it noted over 50 open items that were yet to be determined and priced, and it did not include subcontractor bids.

8. After reviewing the Charter Construction estimate, Mr. Glover sent us a letter with a list of questions for Charter Construction, and he also revised his own Xactimate computer estimate to $106,091, which represented only 29% of the estimated cost from Charter Construction. (When USAA finally engaged its own contractor and appraiser to value the repairs,

DECLARATION OF ROBERT ENGST – 2

USAA's appraiser valued the repair cost at $365,913.01. Unfortunately, that was not until February 2021.)

9. When it became apparent that USAA was not acting in good faith regarding the repairs to our home, we sought assistance from legal counsel.

10. We initially contacted Isaac Ruiz of Plaintiff Litigation Group on October 11, 2019. Over the course of approximately 2-3 weeks, we provided Mr. Ruiz with information about our struggles with USAA, and we gave him information about the contractor estimates we had obtained.

11. On October 21, 2019, Mr. Ruiz participated in a conference call with me, my wife Anna, and Charter Construction to discuss Charter's repair estimate. After the conference call with Charter Construction, I responded to USAA with answers to each of Mr. Glover's questions, and I proposed a phone call between Mr. Glover and Charter Construction.

12. On October 30, 2019, my wife and I received a letter from USAA, stating that they stood by Mr. Glover's Xactimate computer estimate of $106,091, including his incorrect and inferior material selections; that they found Charter Construction's estimate of $372,584 to be unreasonable; and they did not accept my proposal to have a phone call with Charter Construction.

13. On October 31, 2019, Mr. Ruiz contacted me and my wife and declined to represent us.

14. On or about November 4, 2019, my wife, Anna, contacted attorney Will Smart and told him that we were having difficulties with our insurer, USAA. Mr. Smart told her to contact Mr. Ruiz. Anna explained that we had already been in contact with Mr. Ruiz and that Ruiz had declined to represent us, but Mr. Smart said that he would reach out to Mr. Ruiz.

DECLARATION OF ROBERT ENGST – 3

15. On or about November 5, 2019, we were contacted by Isaac Ruiz, who informed us that he had changed his mind and now wanted to represent us.

16. On November 14, 2019, Anna and I signed a contingency representation agreement with Mr. Ruiz's firm, Plaintiff Litigation Group. Note, Section 12 of the contingency representation agreement provided that the firm was to receive no payment of any fees if its attorneys withdrew without cause. [Exhibit 2.]

17. I asked Mr. Ruiz what our options were to resolve the issue with USAA, and I specifically asked him if it made sense to demand an appraisal of the repair cost, as was our right under the Policy. Mr. Ruiz strongly advised against demanding appraisal and recommended litigation with USAA.

18. Mr. Ruiz advised us not to tell USAA that we had retained him, and he advised us to continue communicating with USAA directly. [Exhibit 3.]

19. Mr. Ruiz drafted an IFCA notice and told me and Anna to sign it and personally mail it to the State Insurance Commissioner and not to notify the Insurance Commissioner that we had retained counsel.

20. After filing the IFCA notice, USAA reached out to me and Anna numerous times by phone and in writing. They stated that they wanted to resolve any issues with the claim, and they asked us multiple times to contact them. Anna and I desperately wanted to return their phone calls in hopes of coming to a reasonable resolution, and we asked Mr. Ruiz multiple times if we could respond. Mr. Ruiz strongly advised us not to entertain any outreach from USAA regarding a potential resolution.

DECLARATION OF ROBERT ENGST – 4

21. Mr. Ruiz also made it clear that if we were to reach any resolution with USAA that was not consistent with his advice, then we would be responsible to pay his firm significant fees that might be far higher than the contingent fee stated in the representation agreement.

22. On December 21, 2019, Ruiz & Smart filed the complaint that initiated litigation; USAA filed its answer in late January 2020.

23. On or about December 30, 2019, at the request and instruction of Will Smart, who was now Ruiz's law partner at Ruiz & Smart (formerly Plaintiff Litigation Group), we provided their firm the checks that USAA had tendered in conjunction with various offers to us. Smart marked these checks—totaling $104,353—"REJECTED," and returned them to USAA. [Exhibit 4.] Before sending the checks, I asked Mr. Smart if there was any risk of not recovering those funds and Mr. Smart stated that there was no risk because USAA had already offered to make the payments. Months later, during mediation, we learned that Mr. Smart's advice had been incorrect.

24. On July 27, 2020, USAA filed an amended answer, alleging intentional concealment. USAA argued that although we had provided two contractor estimates from Charter Construction and Harjo Construction early in the claims handling process, we didn't provide the preliminary estimate from McBride Construction until USAA requested all estimates during discovery. Ruiz & Smart were aware of the McBride estimate, and on October 15, 2019, I emailed Mr. Ruiz and told him that the McBride estimate had not been provided to USAA. Ruiz & Smart advised us not to share the McBride estimate with USAA unless requested to do so during discovery, and we followed their advice. [Exhibit 5.]

25. USAA's stated intent in their amended complaint was to void the policy based on their allegations of concealment or misrepresentation. Later in the case, during mediation, our

attorney at that time, Thomas Lether, advised us that there is a much lower bar for USAA to prove concealment or misrepresentation than there is to prove fraud, and he advised us that if USAA were successful in voiding the policy, then we would not be able to recover the $104,353 that Ruiz & Smart had returned to USAA. Mr. Lether also told us that, had we kept those funds and deposited the checks, we would have been able to keep the funds that USAA initially offered, even if USAA were to void the policy.

26. On October 12, 2020, USAA filed its second amended answer, alleging fraud and misrepresentation. USAA's allegations were related to internal cost spreadsheet calculations and emails between employees at Harjo Construction that we were not privy to—we were not recipients and were never copied on them. USAA alleged that profit margin calculations on Harjo's internal spreadsheets and internal emails between employees at Harjo Construction showed an intent to inflate a cost estimate. We never advised Harjo to inflate an estimate for any purpose. Rather, we made it clear to Harjo to write a full and complete estimate for the repairs. Furthermore, it should be noted that the estimate in question was a preliminary budget that totaled $208,598. As noted previously, when the company finally had its own contractor and appraiser value the loss, USAA itself conceded that the repair cost would be $365,913.

27. On October 12, 2020, Ruiz & Smart scheduled a call with me and Anna where they discussed USAA's second amended answer and USAA's aggressive tactics. They did not mention that they might withdraw, nor did they mention any type of potential conflict, nor did they mention anything related to potentially being a witness. We asked Ruiz & Smart for their advice, but during that call they declined to provide any recommended course of action.

28. Mr. Smart later signed a sworn affidavit explaining that USAA's allegations were completely unfounded, describing the motion to amend as, "USAA's attempt to perpetrate a substantial injustice." [Exhibit 6.]

29. On the Morning of October 13, 2020, Mr. Smart took the 30(b)(6) deposition of USAA as a corporate entity. Mr. Lether later told me that USAA stonewalled and provided very little information that would be helpful to our case. Mr. Lether told us that Mr. Smart had been hoping to uncover important information through that deposition to support the bad faith case.

30. Without notice to us, Ruiz (on behalf of Ruiz & Smart) withdrew from the case on October 13, 2020, falsely alleging that my wife and I had requested their withdrawal. This motion was not provided to us before filing.

31. At the time of the withdrawal, Mr. Smart told us that his firm would take a financial loss for the time that they had spent on the case. Mr. Smart never advised us that they would seek attorney fees relating to their representation nor did they advise us that they would serve a lien on any settlement proceeds. Had Ruiz & Smart even suggested otherwise, we would have vehemently objected, as the representation agreement provided for no fees if the firm withdrew.

32. We specifically asked Ruiz & Smart to continue representing us, noting that they were leaving us high and dry in the middle of litigation, but Mr. Smart told us that their unilateral decision to withdraw was final. Mr. Smart told us that our only realistic option was to hire our expert, Thomas Lether, as our attorney. Mr. Smart told us that he had already spoken to Lether about taking over the case and he would agree to do it on an hourly basis (*i.e.,* rather than the contingency arrangement we had with Ruiz & Smart). Mr. Smart reasoned that Lether was already up to speed because he was preparing to be the bad faith expert, and since there were

important deadlines less than three days away, it was imperative to hire someone as soon as possible. Mr. Smart also expressed his belief that no other attorney would take the case on a contingency basis. In reliance on Mr. Smart's recommendation (and in light of the timing and precariousness of our situation), my wife and I called Lether immediately and agreed to hire him.

33. Sincerely believing that we had no other alternative, my wife and I signed an hourly representation agreement with Lether on October 14, 2020. Lether did not explain that Ruiz & Smart may assert a claim to attorney fees or otherwise explain how he would be paid vis a vis Ruiz & Smart. Our agreement with Lether was based on an initial budget of $5,000, which was confirmed via email. [Exhibit 7.] However, Lether did not disclose to us that, by the time we signed the representation agreement that same day, Lether had already recorded over $5,000 in fees, including for work before we had spoken to him, let alone agreed to have him represent us. We did not receive a bill that would alert us to the amount of the charges until weeks later.

34. On October 23, 2020, Mr. Smart provided Lether a draft declaration for review which stated, "My withdrawal occasions a substantial financial loss for my new firm. We have invested more than $60,000 litigating this bad faith case." [Exhibit 8.]

35. Due to the severe prejudice caused by Ruiz & Smart's withdrawal just two days after USAA filed its (baseless) fraud allegations, Anna and I were concerned about additional prejudice caused by Smart's disclosure that his firm was choosing to abandon us, even though it meant forfeiting his fees. Accordingly, we requested that Smart remove the aforementioned statement from his declaration. However, Smart insisted on mentioning his financial hardship in his sworn declaration, but agreed to soften the language to: "…the decision to withdraw was particularly painful financially for myself and my firm…" [Exhibit 9]

36. We understood Smart's declaration to mean that his firm would not seek any attorney fees in the matter, since they were withdrawing without cause, and this reinforced our prior understanding that we owed them no fees. Nobody, not Smart, not Ruiz, and not even Lether ever mentioned anything about withdrawal for cause.

37. On November 4, 2020, at Mr. Lether's direction, I called Mr. Smart to notify him that we were heading to mediation, and to confirm that my wife and I owed nothing to Ruiz & Smart per the terms of the fee agreement because they had voluntarily withdrawn. Smart did not dispute my contention, but he said they had done a lot of work on the case and then refused to speak with me because we were represented by Lether. That conversation lasted less than one minute, as documented by my phone bill. Based on the tone of Mr. Smart's voice, my impression was that Mr. Smart desired to be paid some sort of compensation, and my expectation was that he would take it up with Lether and potentially attempt to negotiate a referral bonus or fee split with him. I notified Mr. Lether of my conversation with Mr. Smart and reiterated to Lether that my belief was that no fees were owed to Ruiz & Smart.

38. On November 5, 2020, Ruiz & Smart filed an attorney fee lien for $86,884 in our case, and emailed a copy directly to Lether. [Exhibit 10.] Lether did not notify us of the lien, or even of the fact that Ruiz & Smart were asserting a right to any fees associated with the case. Ruiz & Smart also did not send notice directly to my wife and me, or take any action to actually notify us of its existence, apart from sending it to Lether.

39. On November 6, 2020, my wife and I met with Lether at his office to prepare for scheduled mediation with USAA. Lether led us in a discussion about attorneys' fees and net settlement amounts. Lether disclosed that his fees to date were approximately $55,000. Lether

did not mention the Ruiz & Smart lien or otherwise provide us notice that Ruiz & Smart would be seeking their attorneys' fees.

40. On November 7, 2020, in preparation for mediation, I emailed Lether a spreadsheet for use during mediation listing every potential fee and cost we knew about, including the $55,000 in fees mentioned by Lether the day before. The spreadsheet also included the $60,000 referenced by Smart in his declaration; in the accompanying email, however, my wife and I made it clear that we did not believe we would have to pay Ruiz & Smart because: (i) Smart told us as much when Ruiz & Smart withdrew, and (ii) Smart's sworn declaration to this Court references the fees as a financial loss to his firm. Lether did not respond or disclose the $86,884 lien. [Exhibit 11.]

41. On November 9, 2020, we participated in mediation with USAA. In conjunction with mediation, Lether suggested that we send the cost impact spreadsheet to the mediator. However, he recommended that we add in *any other costs* that *could potentially be associated with the case*, including fees for his time when working as an expert for Ruiz before being retained as our counsel. To determine these potential costs, Lether asked his staff to re-run their time records and include every potential charge that might be related to our case, regardless of "adjustments for inefficiencies," and including his expert services. Lether's staff emailed a statement totaling $70,828 along with a note stating, "Attached is the pre-bill with expert time included on the same bill." [Exhibit 12.] Neither Lether nor his staff disclosed the Ruiz & Smart lien of $86,884. I updated the spreadsheet to revise the line item to account for the $70,828 for Lether's purported fees and expert hours, and emailed it to the mediator. [Exhibit 13]

42. Also on November 9, 2020, during a break in mediation, I emailed Lether reiterating my understanding that we owed nothing to Ruiz & Smart, and encouraged him to

DECLARATION OF ROBERT ENGST – 10

reach out to Smart, if appropriate. I also attached the Ruiz & Smart representation agreement and told Lether that my understanding was that Ruiz & Smart had no cause for their withdrawal, and that was supported by Mr. Smart's sworn affidavit. [Exhibit 14.] Lether did not dispute my understanding or provide any counterargument, nor did he disclose the lien.

43. I thought it was important to share the Ruiz & Smart representation agreement with Lether so that he had complete information, and also because I knew that Lether and Smart were good friends. (In fact, on two separate occasions, Lether said that he "love[d] [Smart] like a brother.") I thought there was a chance that Smart might ask Mr. Lether for some sort of referral bonus for giving him the case, but given the firm's abrupt withdrawal, and the prejudice it caused our case, I didn't think it would be appropriate for Lether to pay Ruiz & Smart any compensation. Accordingly, it was important for Lether to understand the full background, so as not to feel obligated to pay his friend something that was not owed.

44. During mediation, when we were on the fence about whether to settle or whether to continue with litigation, Lether told us he would modify his fee to the lesser of his hourly rates or a 33% contingency. Lether presented this as a way to "help us out," but it was clear to us that he was trying to convince us to settle and to not worry about the total cost of attorneys' fees that would be deducted from the settlement. Yet he still did not mention the Ruiz & Smart lien. Based on the information we knew at the time, we agreed to Lether's proposal to modify the original fee agreement based on hourly rates with a budget of $5,000 to his proposed contingent fee structure.

45. For some reason, Lether chose not to aggressively pursue reimbursement of attorneys' fees as part of the settlement from USAA, even though it was clear that the appraised value of the repairs would be far higher than USAA's initial lowball offer. Had USAA agreed to

pay even a portion of attorneys' fees, it would have forced Lether to disclose the Ruiz & Smart lien. As it was, however, he was not forced to show his hand.

46. Lether advised us to settle. He explained that while there was minimal risk related to the fraud allegations, there was some risk related to USAA potentially cancelling the policy (in which event, because Mr. Smart had returned the checks to USAA, we would get nothing), and we would still be on the hook to pay Lether's attorney fees—which we now knew were substantial—and we would have to pay to repair our home 100% out-of-pocket. We did not believe that Lether would ask us to pay for his expert fees before he became our attorney, because those were in connection with him acting as an expert before he shifted roles. With this understanding, we agreed to settle.

47. On November 13, 2020, I made revisions and re-saved a version of the spreadsheet we had used during mediation. However, no changes were made to the line item for legal fees because we were still unaware of the Ruiz & Smart lien. [Exhibit 15.]

48. In conjunction with our revisions to the mediation spreadsheet on November 13, 2020, my wife and I reviewed a draft of the settlement agreement, and marked it with a number of comments, questions, and proposed edits, before emailing it to Lether. We did not, however, revise the statement that "…plaintiffs are not aware of any liens…," as that accurately reflected our understanding at the time—we were not aware of any liens at all.

49. On November 25, 2020, we executed a settlement agreement that included the statement that "…plaintiffs are not aware of any liens or other repayment obligations that have attached or might attach to any settlement payments…." Lether advised us to sign the settlement agreement with this provision, and Lether also signed the document himself. We believed this

DECLARATION OF ROBERT ENGST – 12

statement to be true when signed, as we were unaware of the Ruiz & Smart lien, and Lether did not disclose it to us. [Exhibit 16]

50. We signed the settlement agreement on the express understanding that there were not liens, and that we would not owe any attorneys' fees to Ruiz & Smart. This was material to us—had we known that Ruiz & Smart would claim over $80,000 in attorneys' fees, which would come out of our settlement, we would never have agreed to the terms and would never have agreed to settle.

51. On December 3, 2020, my wife and I emailed Lether, to confirm our understanding that $55,000 in fees were owed to him, and asked whether there were any other costs to date. Lether responded with a couple of items, but did not mention the $86,884.60 lien. [Exhibit 17]

52. On February 19, 2021, the appraisal award was issued in the amount of $365,913.01, requiring payment from USAA on March 20, 2021. That amount was based on the appraisal from USAA's appointed appraiser, and it represented an increase of $259,513.61 over the pre-litigation estimate from USAA's internal adjuster of $106,091.38.

53. On February 25, 2021, my wife and I exchanged emails with Lether in which we agreed to pay Lether attorney fees in the amount of $85,771.29, which represented a 33% contingency fee based on the difference between USAA's appraisal award of $365,913.01 and USAA's pre-litigation cost estimate of $106,000. Lether did not mention the lien filed by Ruiz & Smart, thus our understanding was that the net payment to us would be $280,141.72. In fact, it was this understanding that predicated our agreement with Lether regarding the amount of his fees. We would not have agreed to pay Lether these fees if we had any idea that Ruiz & Smart would assert a claim to the remainder of the settlement award.

54. On or prior to March 11, 2021, Ruiz & Smart notified USAA of their attorney lien, thereby causing USAA to delay the settlement payment.

55. On March 11, 2021, Ruiz & Smart sent a letter to Lether, reminding him of the attorney lien that they had previously emailed to him on November 5, 2020. **Lether then notified us of the attorney lien for the first time, more than four months after mediation and more than 15 weeks after we signed the settlement agreement.** [Exhibit 18.]

56. Between March 11 and March 13, 2021, we requested guidance and assistance from Lether regarding what to do about the Ruiz & Smart lien, but Lether declined to assist us, instead he "recommend[ed that we] work out the lien issue with Smart" directly. Lether contended that "I can't get involved in that due to conflict issues." [Exhibit 20] When I asked Lether directly whether he had any idea that Ruiz & Smart might file a lien, he refused to answer, writing, "I cannot be your attorney on a fee dispute with your prior counsel." [Exhibit 20] Lether's refusal to advise us with regard to Will Smart's lien was troubling, not only because Lether had told us multiple times that he "loved Will like a brother" but also because we were faced with a baseless demand for nearly $87,000.00. It felt like both our attorneys were actually working against us—they certainly weren't providing any help at this point—and Anna and I worried that we might be forced to hire another attorney to resolve this, which, unfortunately, we were compelled to do.

57. Prior to March 2021, neither Lether nor Ruiz & Smart had mentioned any potential conflict issues.

58. On Friday, March 19, 2021, I had a phone call with Lether, during which he asked to be absolved from conflicts of interest related to the attorney lien, as a pre-condition to his discussing it with Ruiz & Smart. I declined to release any past conflicts—that damage was

DECLARATION OF ROBERT ENGST – 14

already done—but asked Lether if there was any way we could relieve him of future conflicts, if that could facilitate his assistance with the Ruiz & Smart lien. [Exhibit 21]

59. He followed with an email that misrepresented what we discussed on the phone regarding the ethical "issues." I did not respond to that email, because I did not understand the potential conflicts of interest, and I was very disturbed that Lether's email misrepresented our phone conversation and attempted to distort what had been discussed.

60. On Monday, March 22, 2021, Lether withdrew from the case.

61. Also on March 22, 2021, USAA sent settlement checks that were not written per the terms of the settlement agreement—the payment was split into two checks with one including Ruiz & Smart as a payee. The checks were sent to Lether and, to date, we have only received one check, in the amount of $279,028.41. Prior to litigation, USAA had estimated the repair costs to be $106,091.38, so **the proceeds we've received as a result of litigation total $172,937.03 before deducting attorneys' fees.**

62. After Lether's withdrawal, we were left unrepresented and with only a fraction of the proceeds that we expected to receive from the negotiated settlement agreement.

63. When Ruiz & Smart raised its lien immediately prior to issuance of the settlement payment in March 2021, it was incredibly intimidating to Anna and me, especially considering that Mr. Smart demanded that the full amount of their lien be withheld, "…until the matter is resolved by litigation…." [Exhibit 22] We have asked them multiple times why they believe they are entitled to fees, but they have provided no response other than to pay their demand in full or face litigation.

64. In addition to their threats of litigation, Ruiz & Smart have taken steps to make reaching a resolution as cumbersome as possible. For example, we formally requested our client

file from Ruiz & Smart on August 18, 2021, and after receiving no documents, we followed up on August 27 and September 10. When they finally produced a portion of the file on September 11, 2021, they provided the documents in a format that was difficult to use and was not in the native format that we had requested. We made more unsuccessful requests, and it was only after Bar involvement that Ruiz & Smart finally relented and provided the complete file on October 21, 2021—more than nine weeks after our initial request.

65. Lether's withdrawal before the settlement was resolved, along with the lien and threats of litigation from Ruiz & Smart, have required us to retain counsel and incur over $30,000 in legal fees as well as delays in receiving the USAA settlement proceeds.

66. Anna and I are dismayed that we have been forced to file this motion. What started out as a relatively simple dispute with our insurance carrier about the cost and responsibility for a loss on our home has become an unnecessarily convoluted legal matter. Rather than properly investigate the case, Ruiz & Smart hoped to make a bad faith case based on deposition testimony that never materialized. USAA litigated the case aggressively—in Lether's words, USAA was litigating the case as if it were a $100 million claim—and Ruiz & Smart decided it was not worth continuing on a contingent fee basis. So they dumped us on their friend Lether on an hourly basis, in an effort to force the case to settle. With the same goal, Lether renegotiated his fee agreement to demonstrate the advantage of settling, while he concealed the existence of the Ruiz & Smart lien—even as he advised us to sign a settlement agreement stating that no liens existed. Ruiz & Smart waited until the settlement agreement was signed and the proceeds were to be paid to disclose their lien to anyone other than Lether, and are now demanding that we pay them fees on an hourly basis (including significant time following their withdrawal), notwithstanding the fact

that the representation agreement with Ruiz & Smart was a contingency fee agreement and their withdrawal was of their own accord. [Exhibits 2, 23, 24.]

I DECLARE PURSUANT TO THE LAWS OF PERJURY OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

DATED this 7th day of January, 2022.

Robert Cooper Engst

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under the penalty of perjury under the laws of the State of Washington that on this date I caused to be served in the manner noted below a true and correct copy of the foregoing on the parties mentioned below as indicated:

**By:** [ ] **First Class Mail** [X] **ECF** [ ] **Legal Messenger**

Dated this 7th day of January, 2022, at Seattle, Washington.

DECLARATION OF ROBERT ENGST – 17